Linda S. McAleer, Esq, SBN 249233
Carlos A. Leyva, Esq. FBN 51017
Digital Business Law Group, P.A.
c/o Blake E. Brown. Administrator
Law Offices of Maryann P. Gallagher
205 S Broadway Ste 920
Los Angeles, CA 90012
T: 800-516-7903; F: (800) 257-9128

Attorneys for Defendants, Patrick Robinson, et. al

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Dolores Press, Inc., A California Corp., et. al.** | **Case No.: 2:15-cv-02562-R(PLAx)** |
| **Plaintiffs,** | **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF.** |
| **v.** | |
| **Patrick Robinson, et. al.** **Defendants.** | **Date: June 15, 2020** **Time: 1:30 P.M.** **Courtroom: [Room #9A]** |

## TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

Please take notice that on June 15, 2020 at 1:30 P.M. in the courtroom of the

Honorable Percy Anderson, located at First Street Courthouse, 350 W. 1st Street,

Courtroom 9A, 9th Floor, Los Angeles, California 90012, defendants, Doc's

Dream, LLC, Truth Seekers, Inc., Patrick Robinson, and Bobbi Jones (collectively

"Defendants") do hereby move for summary judgment against Plaintiffs Dolores

Press, Inc. and Melissa Scott (collectively "Plaintiffs"), on Plaintiffs' claims

against Defendants in all the consolidated cases (2:15-cv-01275-R(PLAx), 2:15-

cv-02857-R-PLA, 5:16-cv-00333-R-PLA, 2:16-cv-02562-R-PLA  or "Cases").

The motion is based upon this notice, the Memorandum of Points and

Authorities in support thereof, the concurrently filed declaration of Carlos A.

Leyva (Plaintiff's counsel)[1], affidavit of Martin F. Gwynn,[2] the Statement of

Undisputed Material Facts and exhibits filed in support, on the pleadings and

records on file herein, and upon such other and further matters as may be presented

in connection with this motion.

Dated: 05/11/2020                        **DIGITAL BUSINESS LAW GROUP, P.A.**

  /s/Carlos A. Leyva
Linda S. McAleer, CA SBN 239233
Carlos A. Leyva, Esq. FBN 51017
Digital Business Law Group, PC
3958 Talah Dr.
Palm Harbor, FL 34684
(800) 516-7903 Phone
(800) 257-9128 fax
linda@lindamcaleer.com
cleyva@digitalbusinesslawgroup.com
**ATTORNEYS FOR DEFENDANTS**

---

[1] *See* <u>Exhibit O</u>, attached hereto and incorporated herein by reference. All exhibits are attached hereto and incorporated herein by reference unless otherwise noted.

[2] *See* <u>Exhibit R</u>, Affidavit of Martin F Gwynn, Director of Operations, Digital Business Law Group, P.A.

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................. 1

II.     SUMMARY OF ARGUMENT ............................................................. 2

III.    PROCEDURAL POSTURE ................................................................. 3

IV.     STANDARD ......................................................................................... 4

V.      ARGUMENT & AFFIRMATIVE DEFENSES ..................................... 4

        **Partial Copyright Abandonment** ................................................... 4

             1.   Public Policy Supporting Copyright Abandonment ......................... 5

             2.   Copyright Trolls with a Twist ............................................. 6

             3.   Abandonment ............................................................. 8

        **Equitable Estoppel** ....................................................................... 21

        **Copyright Misuse** ........................................................................... 23

VI.     CONCLUSION .................................................................................. 24

# **TABLE OF AUTHORITIES**

**Cases**

*Alyeska Pipeline Service Company v. Wilderness Society 8212 1977*, 421 U.S. 240, 256 (1975)..........................................................................................6

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)....................................4

*Atlantic Monthly Co. v. Post Pub. Co.*, 27 F.2d 556, 557-558 (D. Mass. 1928).....15

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)............................................24

*Bell v. Combined Registry Co.*, 397 F. Supp. 1241, 1247-1248 (N.D. Ill. 1975)....15

*Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1048 (9th Cir. 1995)...............4

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)...........................................4

*Hadady Corp. v. Dean Witter Reynolds, Inc.*, 739 F. Supp. 1392, 1395-1397 (C.D. Cal. 1990) ........................................................................................14

*Hampton v. Paramount Pictures Corporation*, 279 F.2d 100, 104 (9th Cir., 1960) ....................................................................................................... passim

*Lopez v. Electrical Rebuilders, Inc.*, 416 F. Supp. 1133, 1135 (C.D. Cal. 1976) ....... ............................................................................................ 21, 22, 23, 24

*Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Coop. Prod., Inc.*, 479 F. Supp. 351, 362 (N.D. Ga. 1919) ....................................................... 22, 24

*Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1114 (C.A.9 (Cal.), 1998)......... passim

*National Comics Publications v. Fawcett Publications*, 191 F.2d 594, 598 (2nd

    Cir. 1951) ...................................................................................3, 11

*Pacific & S. Co. v. Duncan*, 572 F. Supp. 1186, 1196 (N.D. Ga. 1983) ................21

*Sandler v. Katz*, 20 C.O. Bull. 621, 625 (S.D.N.Y. 1925) .......................................22

*Sinkler v. Goldsmith*, 623 F. Supp. 727, 732 (D. Ariz. 1985) .................................21

*Wales Indus., Inc. v. Hasbro Bradley, Inc.*, 612 F. Supp. 510, 514 (S.D.N.Y. 1985)

    .................................................................................................13

**Statutes**

17 U.S.C. § 101 ...................................................................................3, 12

17 U.S.C. § 106 ........................................................................................12

17 U.S.C. § 40l(a) .....................................................................................13

17 U.S.C. § 402(a) ....................................................................................13

**Other Authorities**

Robert A. Kreiss, *Abandoning Copyrights to Try to Cut Off Termination Rights*, p.

    98 Missouri Law Review, Issue 1 Winter 1993 Article 7 ........................ 7, 13, 22

**Rules**

Fed. R. Civ. P. 56(c)..................................................................................4

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This case arises from the actions of successful and charismatic televangelist Dr. Eugene Scott ("Doc" or "Dr. Scott"). For a period encompassing approximately nine (9) years, Doc encouraged his followers and the public at large to freely download, reproduce, and distribute an archive of his works ("the Works" or "Works")[3]. *See* Separate Statement of Facts ("SSOF") ##1-6. After Doc's death in 2005, Defendants removed the Works from the Internet. *Id*. This Motion is grounded in the affirmative defenses ("Defenses") enumerated in Defendants' amended answers to Plaintiffs' claims. *See* Doc. 118 (5:16-cv-00333-R-PLA or "Case 00333"); *see also* Doc. 116 (2:15-cv-01275-R(PLAx) or "Case 01275"); Doc. 117 (2:15-cv-02562-R(PLAx) or "Case 02562"). (collectively "Cases"). The affirmative defenses proffered herein are dispositive of *all* Plaintiffs' claims ("Claims") and therefore end five (5) years of litigation before this Court, pursuant to the morass of Cases that Plaintiffs have initiated.

Why this morass of cases? Because Defendants had the temerity to: (1) share Doc's files on the Internet as they were encouraged to do for a period of

---

[3] The term "Works" used herein is the same as the District Court's usage in its previous Order pursuant to cross motions for summary judgment. *See* Exhibit V, p. 2, this Court's Order in Civil Case No. 15-2857-R. The Ninth Circuit held that the previous record ("Previous Record") could be used on remand. *See* Exhibit U, Ninth Circuit's Order.

approximately nine (9) years; and (2) speak out against Doc's widow (Plaintiff Melissa Scott or "Ms. Scott") when the latter *hijacked* Doc's ministry and began substituting her voice for his. SSOF ##1-6. During Doc's lifetime Ms. Scott's role in the ministry was that of an administrative pastor. SSOF #34. Further, that was the role that Doc envisaged for her after he passed—an *administrative pastor* that would continue digitizing his Works so that *his* voice could reverberate around the world "'til Jesus comes". *Id*.; *see also* SSOF ##1-6.

Ms. Scott's ambitions, post Doc's passing, apparently far exceeded what Doc envisaged for her. *Id*. To be clear, Ms. Scott is free to do with Doc's ministry as she sees fit. However, what she is not free to do, as Defendants' Defenses assert, is use legal proceedings to beat the "piss ants"[4] into submission, *contra* the settled law of this circuit, *simply* because she takes issue with Defendants': (1) usage of Doc's (partially) abandoned Works; and (2) exercise of their First Amendment rights.

## II.    SUMMARY OF ARGUMENT

Defendants are entitled to summary judgment on their collective Defenses for the following reasons: (1) because Doc, Plaintiffs' predecessor in interest, *partially abandoned* his Works, specifically with respect to their reproduction,

---

[4] Defendants are the "piss ants," Ms. Scott's term, that she has been figuratively trying to kill, vis-à-vis "spiritual warfare," for many years now. SSOF #29.

distribution, and display on the Internet; and (2) because Defendants detrimentally

relied on Doc's representations (alleged misrepresentations according to

Plaintiffs); and (3) Plaintiffs have misused the Copyright Act to obtain rights that

are not available to them under same.

## III.   PROCEDURAL POSTURE

The Cases' procedural posture is unusual in that the Ninth Circuit's order

remanding said Cases ("Order"), has significant implications with respect to these

proceedings. *See* <u>Exhibit U</u>, Ninth Circuit's Order entered in the Appeal for each of

the Cases on remand. In relevant part the Ninth Circuit held as follows:

> We AFFIRM the grant of summary judgment in the Second Action
> (18-55288) but only as to the initially pled complete abandonment
> claim. ***We do not address the viability of Doc's Dream's Naked***
> ***License/limited abandonment theory***, and our decision should not be
> construed as precluding Doc's Dream or the other alleged infringers
> from asserting that defense (or any other defenses) at trial. ***Nor does***
> ***our decision preclude Doc's Dream from presenting at trial the***
> ***evidence it offered in the summary judgment proceedings***. [Emphasis
> Added].

*See* Order p.11. The evidence that Doc's Dream presented at summary judgement

in Civil Case No. Case 2:15-cv-02857-R-PLA ("Doc's Dream's Dec Action" or

"Dec Action") ("Previous Record") persuaded this Court that the following facts

were *undisputed*: (1) Beginning in the late 1990s, Dr. Scott distributed the Works

for free on his websites; (2) Dr. Scott expressed that publishing the Works on his

websites was aimed to disseminate his works broadly, and that he expected his

works would "stay there until Jesus comes"; and (3) Dr. Scott encouraged the download, reproduction, and redistribution of his Works, but he requested that his followers attribute the Works to Dr. Scott and not use the Works for commercial gain. *See* <u>Exhibit V</u>, District Court's Order. The Previous Record is cited here in its entirety in the Separate Statement of Facts. A few exhibits have been added to the Previous Record as new evidence has been ascertained. These Cases are ripe for a decision on summary judgment because none of the material facts pursuant to the Cases have changed and none are in dispute.

## IV.   STANDARD

Summary judgment is appropriate upon a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *See Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1048 (9th Cir. 1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## V.   ARGUMENT & AFFIRMATIVE DEFENSES

### A.   Partial Copyright Abandonment

As discussed *infra*, Defendants do not argue that Doc abandoned all rights to his Works, *only* those rights associated with the free reproduction, distribution, and display of the Works on the Internet. For example, Plaintiffs, as Doc's successors

-4-

in interest, are free to commercialize said Works however they see fit. Given this Court's summary of the undisputed facts *supra* (i.e. as part of the Previous Record), the only remaining evidentiary issue, with respect to copyright abandonment, is whether Doc exhibited the necessary *intent* to partially abandon his Works.

### 1.    Public Policy Supporting Copyright Abandonment

In writing the 1976 Copyright Act, Congress was concerned about creating copyright and defining the limits of copyright. As far as undersigned counsel can tell from the legislative history,[5] Congress never considered the rare situation in which an author might not want to have a copyright, for the very good reason that people who do not want copyrights will *rarely get into legal fights about their* . *See* Robert A. Kreiss, *Abandoning Copyrights to Try to Cut Off Termination Rights*, p. 98 Missouri Law Review, Issue 1 Winter 1993 Article 7 ("Kreiss"). [Emphasis Added]. The scarcity of cases on abandonment justifies the lack of attention Congress paid to this issue. *Id*.

---

[5] None of the 35 studies prepared in the 1950s and 1960s in connection with the revision of the 1909 Copyright Act deal with abandonment or other defenses to claims of copyright infringement. *See* Studies for the Subcommittee on Patents, Trademarks, and Copyrights of the Committee on the Judiciary, United States Senate, reprinted in 1-2 GEORGE S. GROSSMAN, OMNIBUS COPYRIGHT REVISION LEGISLATIVE HISTORY (1976). Two other major pieces of legislative history are equally silent concerning abandonment. *See also* H.R. REP. No. 1476, 94th Cong., 2d Sess. 47-185 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5660-5801; House Conference Report on the Copyright Act of l976, H.R. REP. No. 1733, 94th Cong., 2d Sess. 69-82 (1976), reprinted in 1976 U.S.C.C.A.N. 5810, 5810-23.

Abandonment is a judicially created equitable doctrine, like laches and estoppel. *Id*. at pp. 98-99. The case for a court of equity permitting abandonment is even easier to make than the case for permitting laches and estoppel. *Id*. This is because abandonment is based on the ***consent and affirmative act*** of the copyright owner, who desires that the copyright be relinquished. *Id*. [Emphasis Added]. In contrast, laches and estoppel are imposed on the copyright owner over his or her objection and after balancing the equities of the parties. *Id*. There is no balancing of equities required in the abandonment analysis—the author either committed the overt acts to abandon his copyright or not.[6]

Here, the necessity of relief in the form of copyright abandonment is self-evident when the underlying facts in the case at bar are considered, especially because, in the Internet and the digital age, wherein we all now live, copyright holders freely give away their content daily to monetize them through some other mechanism.

### 2.       Copyright Trolls with a Twist

If copyright holders can encourage Internet users to freely copy and distribute their works, and then subsequently sue them for copyright infringement, the Internet metastasizes into a copyright infringement factory. "Freemium" is a

---

[6] *See* fn 5 *supra*.

dominant Internet business model where copyright holders engage in the free distribution of copyrighted content "24/7 365"—which is attested to by the consuming public being widely engaged in the downloading of free copyrighted content daily; including but not limited to marketing collateral, apps, videos, and a virtual cornucopia of multi-media. SSOF #25. The difference between *most copyright holders* engaged in this conduct and Plaintiffs, is that the former refrain from suing consumers for the encouraged behavior. As discussed herein, settled copyright doctrine does not countenance infringement under these facts—for example, the doctrine of abandonment militates against such an outcome. But for the abandonment doctrine, the free distribution and reproduction of copyrighted content on the Internet (and elsewhere) would lead to absurd results—with no better example than the *absurd conduct* by Plaintiffs under these facts.

Plaintiffs have demonstrated, through the cases filed with this Court, and by other means, that they intend to sue members of the public that are in possession of one or more of the Works—and certainly will sue all said members that have the temerity to *freely* distribute the Works—even though it is indisputable that said members of the public, like Defendants, acquired the Works with Doc's blessings and encouragement.[7] SSOF ##1-6, 17; *see also* <u>Exhibit G</u>.

---

[7] There is no evidence of illegal activity such as "hacking or theft" that comprises the root cause of the copies now available on the Internet.

Plaintiffs are willing to engage in asymmetric litigation, spending millions on lawsuits that members of the public cannot afford, in order to accomplish their perverse objectives—suing the public for copyright infringement that Plaintiffs' predecessor in interest systematically encouraged. SSOF ##1-6, 9. Plaintiffs themselves sat idle while Doc engaged in this conduct, never once interceding. SSOF ##1-6, 8.

This Court can end this perverse misuse of the legal system by finding partial copyright abandonment. Doc, the original copyright holder, *freely* made his Works available on the Internet and encouraged the downloading, redistribution, display, public performance, and reproduction of same. SSOF ##1-6, 14; *see also* Exhibit B. This is copyright abandonment on its face. *See National Comics* at 598 (holding that *allowing the public to freely copy* is the purposeful manifestation of an overt act of abandonment); *see also Hampton* at 104. [Emphasis Added].

Once abandonment is triggered the author cannot, *ex post facto*, get the copyright *genie* back in the bottle.

**3.      Abandonment**

It is undisputed that a copyright holder's rights may be abandoned. In *Hampton,* the Ninth Circuit stated the standard for copyright abandonment as follows:

> Rights gained under the Copyright Law, 17 U.S.C.A. § 1 et seq., may
> be abandoned. Abandonment of such rights, however, must be

manifested by some ***overt act*** indicative of a purpose to surrender the rights and <u>***allow the public to copy***</u>. *National Comics Publications v. Fawcett Publications*, 2 Cir., 191 F.2d 594, 598. [Emphasis Added].

*See Hampton v. Paramount Pictures Corporation*, 279 F.2d 100, 104 (9th Cir., 1960) (citing with approval *National Comics*) ("Hampton"). The author's right to abandon portions of his copyright, while retaining other portions, is based on the idea that copyrights are divisible. *See generally* 17 U.S.C. § 106. It then follows that an author may abandon certain enumerated rights while retaining others. *See Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1114 (C.A.9 (Cal.), 1998) (stating "abandoning some rights is not the same as abandoning all rights") ("FormGen").

A copyright is a bundle of exclusive rights, each of which can be separately transferred and owned. *See* 17 U.S.C. § 101 (definition of "transfer of copyright ownership"[8]). This divisibility means that different rights in a copyrighted work may be owned by different individuals or entities. *See FormGen* at 1114. For example, an author of a rap song could assign performance rights to one individual, assign the rights to make and sell copies of the music to a second individual, and assign the rights to prepare derivative works to a third individual. *Id*.; *see also* 17

---

[8] Under the Copyright Act's Definitions, "transfer of copyright ownership" is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of *any of the exclusive rights* comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license. [Emphasis Added]. *Id.*

U.S.C. § 106; *FormGen* at 1114. Under the Copyright Act, each of the three assignees would be the owner of the assigned exclusive right. *Id*. Likewise, rights can be divided temporally, with different owners possessing rights for different time periods. *See, e.g., Wales Indus., Inc. v. Hasbro Bradley, Inc.*, 612 F. Supp. 510, 514 (S.D.N.Y. 1985) (dividing copyright by assigning rights for a three-year term while retaining the remainder).

It follows, from the discussion above, that if each of the enumerated rights under the Copyright Act has a separate legal existence, and can be separately owned and transferred, then each of them can also be separately abandoned. *See FormGen* at 1114; *see also Hampton* at 104. For example, an author with the requisite *intent* could abandon the exclusive right to make copies of a work, while retaining other enumerated rights. *See FormGen* at 1114. Or an author could abandon the rights to perform or display a work, while retaining the rights to make and distribute copies. *Id*. Further, abandonment has nothing to do with whether a copyright notice is affixed to works or not. Under the Berne Amendments to the Copyright Act, the law no longer requires that a copyright notice be placed on published copies.[9] *See Kreiss* p. 94. Therefore, an author can abandon her

---

[9] Sections 401(a) and 402(a) make notice optional on copies and phonorecords, respectively: "Whenever a work protected under this title is published in the United States or elsewhere by authority of the copyright owner, a notice of copyright as provided by this section *may be placed* on publicly distributed copies from which the work can be visually perceived, either directly or with the aid of a machine or device. 17 U.S.C. § 40l(a) [Emphasis Added].

copyright despite affixing a notice to it or retain her copyright without a notice. *Id*.
It is the overt act that is dispositive with respect to abandonment. *See Hampton* at
104. What an author says or does before or after manifestation of abandonment is
not relevant to the resolution of the issue. *Id*.

Here, as discussed *infra*, Doc abandoned his rights to the free distribution,
reproduction, display and public performance (i.e. all rights under § 106 of the
Copyright Act) of the Works on the Internet (partial abandonment)[10] because, *inter
alia*, for nearly nine (9) years Doc made said Works *intentionally and
unequivocally freely available* on the Internet[11]. SSOF ##1-6; *see also* <u>Exhibit D</u>.
Defendants concede that the commercial rights to the Works remain with the
copyright holder and proffer no argument in that regard—said commercial rights
are not relevant to the relief that Defendants seek herein. *See FormGen* at 1114.

As discussed *infra*, Doc *explicitly and implicitly* abandoned the copyrights in
his Works.

---

[10] Defendants expressly do not assert that Doc abandoned his commercial rights to these
Works—or any other rights, other than the free reproduction, distribution, performance, and
public display online.
[11] The District Court's prior order found these facts to be undisputed, and therefore, need not be
relitigated here. *See* <u>Exhibit V</u>, District Court's previous Order on cross motions for summary
judgment.

### a. Doc's acts of commission abandoned his copyrights.

It is well settled that copyright abandonment may be found explicitly. *See Hampton* at 104; *see also FormGen* at 1114; *Hadady Corp. v. Dean Witter Reynolds, Inc.*, 739 F. Supp. 1392, 1395-1397 (C.D. Cal. 1990) (distributing copies of commodity newsletter with notice stating that copyright protection only lasted for two days); *Bell v. Combined Registry Co.*, 397 F. Supp. 1241, 1247-1248 (N.D. Ill. 1975) (explicitly allowing others to make and distribute copies of the poem Desiderata without restriction); *Atlantic Monthly Co. v. Post Pub. Co.*, 27 F.2d 556, 557-558 (D. Mass. 1928) (explicitly distributed copies of a letter to publishers without requiring a notice of copyright).

It is undisputed that Doc *explicitly* made his Works freely available on the Internet for a period of approximately nine (9) years. SSOF ##1-6; *see also* Exhibit E; Exhibit V, District Court's Previous Order (finding these facts to be undisputed). During that entire time, Doc never sought to commercialize the Works at issue either through direct sales or any other online mechanism[12]. Instead, Doc was an early pioneer in giving his Works away for free so that he could monetize them in a more profitable manner, such as tithing. SSOF #22;

---

[12] Although Plaintiff Dolores Press, Inc. did commercialize some of Doc's Works via other channels, www.genescottunivernet.com, the commercial rights in the copyrights are not what is at issue in the case at bar, as discussed *infra*.

*see also* <u>Exhibit J</u>. He was an early user of cassette tapes, satellite dishes, Web TV, and subsequently the Internet. SSOF #3; *see also* <u>Exhibit C</u>.

Today, giving away copyrighted content to monetize it through separate mechanisms and channels is commonplace and axiomatic, as any "smart phone" user can readily attest. In the late 1990's, when Doc first started freely giving his Works away on the Internet, until the time of his death in 2005, the practice was not as prevalent and ubiquitous as it is today. Doc was a savvy marketeer; one who made use of every conceivable technology he could master to get the Word out to the world, and thereby grow his ministry. Doc clearly understood that he could monetize[13] his copyrighted content more effectively through *tithing* rather than through the commercialization of his Works. SSOF #22; *see also* <u>Exhibit J</u>. For example, Doc encouraged congregants of his ministry to tithe ten percent (10 %) of their monthly earnings. *Id*. Moreover, new congregants were encouraged to tithe ten percent (10 %) of their *entire net worth* when first joining the ministry. *Id*. One member sold his house to tithe 10% of his assets, thereby acquiring the status of a member in good standing. SSOF #22; *see also* <u>Exhibit A</u>, Aff. Mortensen p. 23-24, ¶12 (highlighted section).

---

[13] In past litigation Plaintiffs have taken umbrage at using a financial term to refer to the ministry; however, here the use of "monetize" is nothing more than a convenient term that shows that ministries, like all other organizations, must raise revenue to remain viable concerns.

The facts discussed *supra*, pursuant to Doc's marketing and business acumen, demonstrate that Doc had financial motives to make his Works freely available. *Id.* A short hypothetical is illustrative. Assume *arguendo* that a prospective congregant of Doc's ministry made $50,000.00 a year. Let us further assume that this individual had no net worth to speak of. Doc's ministry would nonetheless receive $5,000 in tithing per year, for the lifetime of the faithful congregant. This same congregant would be unlikely to consume $5,000.00 per year in cassette tapes, DVDs, etc. The *tithing* and the *consumption* would come from the same pot of money; therefore, Doc's strategy was both clever and profitable. He could reach thousands of prospective congregants through the free availability of his Works on the Internet and monetize the converts more effectively through tithing—the Internet give-away functioning as an effective lead generator, as it does for millions of copyright holders that engage in this same online practice today. SSOF #25. To be clear, although Doc had financial reasons for giving away his Works—nothing more than Doc's *overt acts* of freely giving away said Works on the Internet is *all* that is required for this Court to find abandonment. *See generally Hampton* at 104.

Doc placed no technological impediments to the download, reproduction, and distribution of his Works from the Internet. SSOF ##1-6; *see also* <u>Exhibit B</u>. Not only did Doc not place technical impediments to downloading and

-14-

distribution, his websites actively encouraged it. *Id*. Ms. Scott admits that she stopped distributing the Works on the Internet because she was afraid that if Doc's Works remained freely available, there would be no incentive for congregants to continue tithing to her nascent ministry. SSOF #29. Her reasoning was fatally flawed, both from a marketing perspective and from the "blow back" from Doc's loyal congregants that had become accustomed to both *tithing and accessing* his Works freely; many of whom left the ministry after the Works were removed from the Internet. SSOF ##1-6, 22; *see also* <u>Exhibit E</u>, p. 2, p. 4, p. 8 and p. 10. These are the "piss ants" that Ms. Scott indicates she has been figuratively trying to kill, vis-à-vis "spiritual warfare," for many years now. SSOF #29. Ms. Scott's marketing acumen was not nearly as acute as that of her late husband. By removing the Works from the Internet, after they had been *freely available* for nine years, she went against the *tsunami* of what eventually became the Internet's dominant marketing model—giving content away for free so that you can monetize it elsewhere (i.e. "Freemium"). SSOF ##1-6, 25.

Whatever the back story of the ministry before and after Doc's death in 2005, the case at bar turns on Doc's conduct (i.e. overt acts) prior to the time of his passing. SSOF ##1-6; <u>Exhibit B</u>. The facts here mirror the facts in *FormGen*. *See generally FormGen*. In *FormGen*, defendant encouraged users of its gaming software ("Software") to create extensions to its games by building external

"levels" ("Levels") through a utility provided by defendant known as the "Build Editor." *Id*. at 1109. The Build Editor allowed users to create different combinations of scenery, aliens, and other challenges that would then be utilized by the Software, in effect extending it. *Id*. To expand the reach of the Software's ecosystem, Defendant encouraged users to upload and freely give away their Levels on the Internet. *Id*. By so doing, the Ninth Circuit stated *unequivocally* that defendant had likely abandoned any copyrights that it might have held in said Levels. *Id*. at 1114. However, the Court held that even though defendant had abandoned its rights to control the free distribution and reproduction of the Levels on the Internet, it had *not abandoned its rights to commercialize* them (holding that "abandoning some rights is not the same thing as abandoning all rights.") *Id*. [Emphasis Added].

Here the facts are analogous to *FormGen*. Doc gave his Works away for free for a period of approximately nine years. SSOF ##1-6; *see also* <u>Exhibit B</u>.  During that time thousands, if not hundreds of thousands, of Doc's followers downloaded and distributed them. This is the canonical fact pattern that Judge Learned Hand indicated was a manifestation of an overt act that leads to abandonment (i.e. allowing the public to make free copies of the work). *See Hampton* at 104. Indeed, that is the *sine qua non* of abandonment. *Id*. However, analogous to the holding in *FormGen*, Plaintiff does not argue that Doc abandoned *all rights* in his Works. *See*

-16-

*FormGen* at 1114. Defendants herein allege no manifestation of overt acts that would have led Doc to abandon the *commercial rights* in his Works or the rights to any of his other content, such as books. The only issue before this Court is whether Doc, like the defendant in *FormGen*, gave up his rights to freely distribute and reproduce his Works on the Internet; and to sue those who downloaded and shared the Works at his behest. Defendants argue that he did, analogous to any other copyright holder who gives his work(s) away free on the Internet—there are now millions that do so daily.

To allow copyright holders to freely give their works away on the Internet and then subsequently file copyright infringement suits against Internet users that take them up on the offer would go against the spirit of every equitable doctrine available under American jurisprudence. Further, there can be no doubt that such conduct goes against the spirit and the letter of the law of copyright abandonment, and therefore cannot stand. *See Hampton* at 104; *see also FormGen* at 1114.

Plaintiffs' fatally flawed position, throughout this litigation, is that they conflate the commercial[14] rights in Doc's works, with the online rights in the Works that Doc relinquished and abandoned during his lifetime. As *FormGen* demonstrates, the two are not one and the same. *See FormGen* at 1114. Doc's

---

[14] Refers to Doc's packaging and selling his works through Dolores Press, Inc. or via other channels.

successors in interest are free to commercialize the Works as they see fit; what Plaintiffs must be prohibited from doing is denying the free distribution and reproduction, and other rights in the Works on the Internet—and from suing those, like Defendants, that may have participated in said conduct.[15] Defendants never attempted to commercialize the Works. SSOF #27; *see also* <u>Exhibit N</u> (highlighted content). Defendants did nothing more than what Doc encouraged the public to do during his lifetime—that is, freely distribute and reproduce the Works while giving attribution, so that said Works could continue to be available to the masses forever. *Id*.

### b. Doc's acts of omission abandoned his copyrights.

Copyright abandonment may be found implicitly as well. *See Sinkler v. Goldsmith*, 623 F. Supp. 727, 732 (D. Ariz. 1985) (finding abandonment of copyright in late husband's letters when letters were published in a book with permission or acquiescence of surviving spouse); *see also Pacific & S. Co. v. Duncan*, 572 F. Supp. 1186, 1196 (N.D. Ga. 1983)(finding intent by TV station to abandon copyright in certain broadcast videotapes of news events where station destroyed videotapes, sometimes only a week after the broadcast); *See Lopez v. Electrical Rebuilders, Inc.*, 416 F. Supp. 1133, 1135 (C.D. Cal. 1976) (finding

---

[15] *See Dolores Press, Inc. v. Bobbi Jones*, Central District of California, Case No. 5:16-cv-00333-R-PLA.

intent to abandon copyright in a sequential numbering system identifying automobile distributors where plaintiff *knew of widespread industry use* of the code numbers and where she herself printed price lists for customers using the code numbers without any copyright notice) ("Lopez"). [Emphasis Added].

Doc, during his lifetime, never sued anyone for copyright infringement pursuant to downloading, reproducing and distributing his Works from the Internet. SSOF #8; *see also* <u>Exhibit F</u>.  Further, Doc never sent out cease and desist letters to those engaged in same. *Id*. Defendants acknowledge that most courts have found that lack of copyright enforcement does not, in and of itself, amount to an overt act of abandonment. *See*, e.g., *Hampton at 104*; *see also Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Coop. Prod., Inc.*, 479 F. Supp. 351, 362 (N.D. Ga. 1919).[16] However, lack of enforcement does provide circumstantial evidence of Doc's *intent to abandon*, because as discussed *supra*, copyright holders that intend to abandon *rarely get into legal fights about their copyrights*. *See Kreiss* at 98. [Emphasis Added]. Further, Doc implicitly abandoned the copyrights in his Works by encouraging thousands of Internet users to download, possess, reproduce and distribute his Works for approximately nine (9) years *without ever taking any action to prevent them from doing so*. SSOF ##1-6; *see also Lopez* at 1135.

---

[16] There has been at least one court that found failure to enforce tantamount to abandonment. *See Sandler v. Katz*, 20 C.O. Bull. 621, 625 (S.D.N.Y. 1925).

Here, like the plaintiff in *Lopez*, where this District found copyright abandonment at summary judgment, Doc was aware of the actions of thousands of Internet users freely using his Works and took no action. *Id.*; SSOF ##1-6;  *see also* Exhibit E.  As the court in *Lopez* states: "Whether or not the plaintiff intended to lose her copyright by this action, she clearly intended to allow public use…". *Id.* Here there can be no doubt as to Doc's intent to allow public use. Therefore, this case, like *Lopez*, is ripe for a decision on summary judgment, especially because Plaintiffs **admit** that Doc freely gave his Works away on the Internet. *Id.*; *see also* fn. 5 *supra*. To be sure, the facts here militate for abandonment even more so than the facts in *Lopez*. *Id*. As discussed *supra*, public use is the *sine qua non* of abandonment. *See Hampton* at 104.

There is no evidence in the record that Doc ever intended for his Works to be removed from the Internet after his passing. His Last Will & Testament contains no such evidence. SSOF #35. His final instructions to Defendant Dolores Press, Inc. vis-à-vis "board minutes" contains no such evidence. SSOF #36. To the contrary, one of Doc's confidants during the creation of his online Works admits that Doc intended the Works to last "'til Jesus comes." SSOF #33. Doc only placed two conditions on the free distribution of his Works on the Internet: (1) his desire for attribution; and (2) that consumers refrain from the commercialization of his Works. SSOF #19. Neither prevents this Court from finding abandonment.

The doctrine of *partial copyright abandonment* militates against these proceedings—it represents a complete bar to same. For the reasons proffered *supra*, Defendants ask this Court to grant their partial copyright abandonment defense and dismiss all Plaintiffs' copyright Claims accordingly.

**B.      Equitable Estoppel**

Equitable estoppel ("Estoppel") is a doctrine that has been part of American jurisprudence for well over one-hundred years. *See Wehrman v. Conklin*, 155 U.S. 314, 327, 15 S.Ct. 129, 39 L.Ed. 167 (1894). The essential elements of Estoppel are: (1) misrepresentations on plaintiff's part; and (2) detrimental reliance on the part of a defendant. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 684-85 (2014).

Here for over nine years Doc made the Works freely available on the Internet for the consuming public to *download, reproduce, display, perform, and distribute*; he systematically encouraged the public to do so. SSOF ##1-6. In fact, many felt it incumbent upon them as congregants to follow Doc's instructions and spread the Works far and wide. *Id*. As discussed *supra*, during Doc's lifetime he never sued any member of the consuming public for the conduct that he openly encouraged. SSOF #7. Indeed, it would have defied a basic sense of decency to encourage the public to engage in said conduct and then subsequently sue them for same.

It was not until his successor in interest, Ms. Scott, *hijacked* his ministry after Doc's death, and began substituting her voice for his, that the copyright infringement suits, similar to the laundry list of suits promulgated against Defendants herein, commenced. SSOF ##1-6. It was clear that Ms. Scott's role, after Doc's passing, was to be one of an Administrative Pastor (i.e. according to Doc)—whose sole purpose was to ensure that *Doc's* voice remained on the wires and airways "'til Jesus comes." *Id*.; SSOF #34. Doc never envisaged that Ms. Scott would substitute her voice for his. *Id*. Doc likewise never envisaged that his Works would be *unceremoniously* removed from the Internet upon his passing— essentially ensuring the opposite of what he desired for his patrimony and contrary to his promise to keep the Works available for his faithful followers until Jesus comes, on which they relied upon when tithing. SSOF #33.

Doc made both express and implicit representations concerning how he intended the public to use his Works on the Internet. Defendants relied on Doc's representations to their detriment—the evidence of which are the copyright and trademark infringement suits now before this Court. *See generally* SSOF##1-6; *see also* SSOF #1, Exhibit A, pg. 25. The doctrine of Estoppel militates against Plaintiffs' Claims—Defendants' Estoppel defense represents a complete bar to same (i.e. all Claims, both copyright and trademark).

For the reasons proffered *supra*, Defendants ask this Court to grant their Estoppel defense and dismiss all Plaintiff's Claims accordingly.

### C.      Copyright Misuse

Copyright misuse is an equitable defense to copyright infringement. *See MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 941 (9th Cir. 2010). To establish copyright misuse, a defendant must establish *either*: (1) that [the plaintiff] violated the antitrust laws, or (2) that [the plaintiff] illegally extended its monopoly beyond the scope of the copyright or violated the public policies underlying the copyright laws." *See Microsoft Corp. v. Compusource Distribs., Inc.*, 115 F.Supp.2d 800, 811 (E.D.Mich.2000) ("Compusource").

Here Plaintiffs engaged in conduct that implicated both prongs. First, Plaintiffs viewed Defendants as potential competitors in the use of Doc's Works and therefore attempted to eliminate the competition by using the Copyright Act, not to seek infringement damages, but rather to deny Defendants their First Amendment rights to free speech, and thereby silence the competition and those, like Defendants, that spoke out against Ms. Scott's nascent ministry—wherein Doc's voice was systematically silenced in favor of hers. SSOF ##1-6.

There is also ample additional evidence of Plaintiffs' copyright misuse beyond the contours of this case. Plaintiffs attempted to prohibit a Library of Congress ("LoC") subject matter expert ("SME") from proceeding, in

collaboration with the LoC, in creating a collection of Doc's works to be made

available through LoC facilities. SSOF #33. Plaintiffs sent a cease and desist letter

to the SME threatening the latter with copyright infringement. *Id*. Plaintiffs knew,

or should have known, that the SME's work with the LoC was in the public

interest and sanctioned under settled law. *Id*. Plaintiffs were notified of the SME's

LoC activity by another individual that worked on the project. *Id*.

Defendants attempt at eliminating the competition by using the Copyright

Act, flies in the face of U.S. antitrust laws. *See Compusource* at 811; *see also* 15

U.S. Code § 2 (Monopolizing trade).  The Sherman Act prohibits monopolizing

"any part of the trade or commerce among the several States." *Id*.; *see also*

*Thornhill Pub. Co., Inc. v. General Telephone & Electronics Corp.*, 594 F.2d 730,

732 (9th Cir. 1979).

## VI.  <u>CONCLUSION</u>

As demonstrated *supra*, there are no material facts in dispute with respect to

Plaintiffs' Claims. Doc's actions indisputably and *intentionally*, both explicitly and

implicitly, *partially abandoned* the copyrights to his Works to the public domain.

Plaintiffs are incapable of sustaining their evidentiary burden as to the overt acts.

Further the doctrine of Estoppel is a complete bar to all of Plaintiffs' Claims, both

copyright and trademark. Therefore, Defendants are entitled to summary judgment

in their favor, as a matter of law. Further, Defendants ask this Court to enjoin

Plaintiffs from continuing their abusive and frivolous lawsuits as to similarly situated persons or entities—that is, all persons or entities that acquired Doc's Works via the Internet, wherein the latter encouraged them to do so.